NO. COA13-661

NORTH CAROLINA COURT OF APPEALS

Filed:  1 July 2014

STATE OF NORTH CAROLINA

v.

THORNE OLIVER WATLINGTON

Alamance County
Nos. 11 CRS 55481, 54816, 54822

Appeal by defendant from judgments entered 5 October 2012 by Judge Henry W. Hight, Jr., in Alamance County Superior Court. Heard in the Court of Appeals 9 December 2013.

*Attorney General Roy Cooper, by Special Deputy Attorney General Grady L. Balentine, Jr., for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defenders John F. Carella and Benjamin Dowling-Sendor, for Defendant.*

ERVIN, Judge.

Defendant Thorne Oliver Watlington appeals from judgments sentencing him to a term of eight to ten months imprisonment based upon his conviction for felonious breaking or entering, to a consecutive term of eight to ten months imprisonment based upon his conviction for felonious larceny, to a consecutive term of fourteen to seventeen months imprisonment based upon his conviction for possession of a firearm by a felon, and to a consecutive term of sixty days imprisonment based upon his

conviction for assault by pointing a gun. On appeal, Defendant contends that the trial court erred by refusing to admit the contents of certain text messages and by failing to deliver his requested instruction concerning the manner in which the jury should evaluate the validity of eyewitness identification evidence. After careful consideration of Defendant's challenges to the trial court's judgments in light of the record and the applicable law, we conclude that the trial court's judgments should remain undisturbed.

## I. Factual Background

### A. Substantive Facts

#### 1. State's Evidence

##### a. Background Information

Defendant's cousin, Loven McLaughlin, has known Defendant his entire life. In the summer of 2011, Defendant came to live with Loven McLaughlin and Loven McLauchlin's mother in the Forestdale Apartments because Defendant was not getting along with his own parents. In the latter part of July, Loven McLaughlin's mother told Defendant that he would have to leave. After Defendant's departure, Loven McLaughlin noticed that Defendant was sleeping in the woods near the Mellow Mushroom.

## b. Firearm Theft

In July 2011, Cody May, who had gone to high school with Defendant, lived in the Forestdale Apartments. After seeing Defendant in the apartment complex, Mr. May reestablished a connection with him.

On 25 July 2011, Mr. May stayed home from work. At noon, he left to go to a medical appointment with his girlfriend to learn the gender of their baby. As a result of the fact that Defendant was present when Mr. May departed, the two of them left simultaneously. Defendant had only been to Mr. May's apartment on a few occasions before the date in question.

About forty-five minutes after leaving his apartment, Mr. May realized that he had forgotten something and returned home. Upon arriving at his apartment, Mr. May discovered that the back door had been kicked in and that an Xbox video game system; three rifles, including a Norinco SKS with a laser sight and that held 7.62 millimeter rounds; and a laptop had been stolen.

## c. Mellow Mushroom Incident

Kenneth Pryor was working at the Mellow Mushroom on the evening of 27 July 2011. After going outside for a cigarette break, Mr. Pryor noticed a man exiting his truck. Upon making this observation, Mr. Pryor yelled at and ran towards the intruder, causing him to head in the opposite direction. As Mr.

Pryor caught up with the intruder, the intruder turned around, pulled what appeared to be an SKS rifle out of a bag, pointed it at Mr. Pryor, and told him to lie down on the ground. Instead of complying with this command, Mr. Pryor ran in the opposite direction.

A few days later, Mr. Pryor identified Defendant as his assailant after viewing a photographic lineup, claiming to be 90% certain that his identification was accurate. At trial, however, Mr. Pryor only expressed a 50% certainty that his identification of Defendant as the assailant was correct. In support of Mr. Pryor's identification testimony, Loven McLaughlin testified that he had gone to the Mellow Mushroom on the date of the incident involving Mr. Pryor so that Defendant could use his cell phone and that, upon arriving at the Mellow Mushroom, he had observed Defendant being chased, displaying a firearm with a laser sight, and chasing the individual who had been pursuing him.

### d. Arby's Incident

On the night of 29 July 2011, Anja Frick and Jessi Richardson were working at the Arby's Restaurant on Huffman Mill Road. After helping Ms. Frick close the store at around 1:40 a.m., Ms. Richardson got into her car. At that point, she noticed an African-American male standing beside her car and

gesturing as if he wanted her to roll down her window or exit the car. After Ms. Richardson did neither, the man went away.

As Ms. Frick locked the door to the store, she saw a light emanating from a laser shining on the wall beside her. Although Ms. Frick initially believed that the light had been caused by a co-worker or either her father or her brother, who had come to pick her up, an individual approached her as she neared the vehicle in which she was to ride. After telling this person to go away, Ms. Frick realized that another individual was holding a long gun with a laser sight to her father's head on the other side of the car.

After Ms. Frick's father stated that he did not have any money, the individual who had approached Ms. Frick said, "just shoot him." At that point, Ms. Frick's father realized that another person was present and saw that this person was pointing a rifle directly at his head. Eventually, the armed assailant took wallets from both Ms. Frick's father and brother and took a cell phone from her brother before running towards the woods with the individual who had approached her. As the men ran away, one of them said, "give me the gun." Ms. Frick then went to a nearby Walmart with her father and brother and called the police. Andre McLaughlin, Loven McLaughlin's first cousin,

testified that he and Defendant had committed the Arby's robbery.

On the following morning, Ms. Frick's father and brother returned to the scene of the robbery in the hope of finding their wallets, which contained family photographs. As the two men looked for their wallets, they found an identification card that contained a photograph of Defendant near the edge of the parking lot. Ms. Frick's father stated, "that's the guy that robbed us," as soon as he looked at it. Ms. Frick's father had a 70% level of confidence in the accuracy of his identification of the person depicted on the identification card as one of the perpetrators of the robbery. He then called the police, informed them that he had found the card, and left it in their possession. At trial, Ms. Frick's father identified Defendant as being the individual who had robbed him and his son.

### e. Apprehension of Suspects

During the course of the investigation into the Arby's robbery, Ms. Frick's brother provided Detective Gary Matthew Fitch of the Burlington Police Department with his cell phone number. After Detective Fitch called Ms. Fitch's brother's cell phone in order to determine its location, investigating officers went to the Forestdale Apartments and began randomly knocking on

doors for the purpose of seeking information concerning the Arby's robbery.

At approximately 12:30 p.m., the investigating officers went to Apartment H-F. After knocking and receiving no response, the investigating officers noticed two cell phones in the rear of a nearby Honda automobile, one of which resembled the cell phone that had been taken from Ms. Frick's brother. In addition, the investigating officers noticed that there was a rifle shell in the front seat. Upon calling the number assigned to Ms. Frick's brother's cell phone, the investigating officers heard a cell phone vibration emanating from the interior of the Honda automobile.

At approximately 3:00 p.m., Rashawn Alston emerged from Apartment H-F and entered the Honda automobile. Investigating officers detained Mr. Alston before he was able to leave. About an hour later, Loven and Andre McLaughlin came out of the same apartment and were taken into custody. Upon learning that yet another individual remained in the apartment, investigating officers entered the apartment and detained Defendant. During a subsequent search of the apartment, officers found a wallet that resembled the one that had been taken from Ms. Frick's father. At a nearby abandoned building, investigating officers found a vehicle that contained a rifle with an attached laser sight and

7.29 by 39 millimeter rounds that had been loaded into an SKS magazine. In addition, Defendant's fingerprints were found on an ammunition box seized from the vehicle.

## 2. Defendant's Evidence

Defendant and Loven McLaughlin, with whom he had grown up, are second cousins. Defendant knew Andre McLaughlin from high school. After graduating high school, Defendant enlisted in the Army. While serving in the military, Defendant was arrested for being in a stolen vehicle, entered a negotiated plea to a felony, and received a twelve-month sentence.

After his release from incarceration, Defendant went to stay with Loven McLaughlin. Defendant denied that Loven McLaughlin's mother had requested that he leave and claimed, on the contrary, that Loven McLaughlin was in the process of leaving as the result of numerous noise complaints. Upon being re-called, however, Loven McLaughlin testified that his mother had told Defendant that he needed to leave because she had heard that he was getting into trouble around town.

After coming to live with Loven McLaughlin, Defendant visited Mr. May, whom he had known in high school, on three occasions. On the first visit, during which he was accompanied by Loven McLaughlin, Mr. May showed a pistol to the two men. In the course of the second visit, during which Loven McLaughlin

was not present, Mr. May showed Defendant a number of guns and asked for Defendant's help in locating a purchaser for these weapons. Mr. May did not ever show Defendant an SKS rifle. Subsequently, Defendant mentioned Mr. May's request to Loven McLaughlin and Mr. Alston, whom he had met at Loven McLaughlin's apartment. The third and final visit to Mr. May's apartment occurred on the day of the theft. During his visits to Mr. May's apartment, Defendant had noticed ammunition crates in the living room and touched one of them given his curiosity about what was inside.

Defendant denied having returned to Mr. May's apartment on the day of the theft, breaking into Mr. May's apartment, or stealing firearms and ammunition from Mr. May. Similarly, Defendant denied having asked Loven McLaughlin to come to the Mellow Mushroom or having pointed a firearm at Mr. Pryor.

Although he initially told investigating officers that he and his friends had been at home at the time of the Arby's robbery, Defendant testified at trial that, after Loven McLaughlin and Andre McLaughlin arrived at the apartment, a woman named Sonia, whose last name he did not recall, picked him up and took him to a hotel, where they stayed all night. The following morning, Defendant returned to Loven McLaughlin's apartment, where he fell asleep. Upon awakening, Defendant

noticed that the house was empty, called Loven McLaughlin's phone to find out where he was, and went to a Kmart for the purpose of meeting Loven McLaughlin and Andre McLaughlin.

Subsequently, Mr. Alston picked the group up and took them back to Loven McLaughlin's apartment. After arriving at the apartment, however, Loven McLaughlin observed that investigating officers were in the area. Although an officer knocked on the door, no one answered. At that point, Defendant decided to sleep for a few hours.

Once Defendant woke up, the members of the group began leaving the apartment. However, Defendant decided to use the restroom before exiting. As he left the restroom, investigating officers entered the apartment and took him into custody. He was then taken to the police department for questioning.

Defendant speculated that he might have dropped his identification card near the Arby's at which the robbery occurred since he regularly used a walking route near that location. In a letter that Defendant wrote to Mr. May after his incarceration, Defendant denied having stolen anything from Mr. May, claimed to have been in Raleigh at the time of the theft, and opined that Mr. Alston had committed the theft given that evidence of the theft had been found in his car. In addition, Defendant told Mr. May that he had reached the conclusion that

Mr. Alston was the culprit because Mr. Alston had mentioned an Xbox 360 to him and because Defendant had told Mr. Alston about Mr. May's guns. Finally, Defendant requested that Mr. May contact Loven McLaughlin on his behalf and provided Mr. May with Loven McLaughlin's number, which he listed as (336) 263-9913.

## B. Procedural History

On 31 July 2011, warrants for arrest were issued charging Defendant with two counts of robbery with a dangerous weapon, two counts of attempted robbery with a dangerous weapon, possession of a stolen motor vehicle, possession of stolen property, breaking or entering a motor vehicle, assault by pointing a gun, financial transaction card theft, and possession of a firearm by a felon. On 29 August 2011, the Alamance County grand jury returned bills of indictment charging Defendant with two counts of robbery with a dangerous weapon; two counts of attempted robbery with a dangerous weapon; possession of a stolen motor vehicle; possession of stolen property; breaking or entering into a motor vehicle; assault by pointing a gun; financial transaction card theft; and possession of a firearm by a felon. On 1 September 2011, a warrant for arrest charging Defendant with felonious breaking or entering, felonious larceny, and possession of stolen goods was issued. On 5 March 2012, the Alamance County grand jury returned a bill of

indictment charging Defendant with felonious breaking or entering, felonious larceny, and possession of stolen goods. On 25 September 2012, the State voluntarily dismissed the financial transaction card theft charge.

The charges against Defendant came on for trial at the 25 September 2012 criminal session of the Alamance County Superior Court before the trial court and a jury. At the conclusion of the trial, the jury found Defendant guilty of felonious breaking or entering, felonious larceny, one count of felonious possession of stolen property, breaking or entering a motor vehicle, assault by pointing a gun, and possession of a firearm by a convicted felon; not guilty of one count of attempted robbery with a firearm, possession of a stolen motor vehicle, and a second count of possession of stolen property; and failed to reach a unanimous verdict with respect to two counts of robbery with a dangerous weapon and a second count of attempted robbery with a dangerous weapon.[1] After arresting judgment in

---

[1]The effect of the jury's verdict in practical terms was to convict Defendant of breaking into Mr. May's apartment and stealing his laptop computer, Xbox, and firearms; breaking into Mr. Pryor's motor vehicle, assaulting Mr. Pryor by pointing a gun, and possessing a firearm at the time of the assault upon Mr. Pryor; to acquit Defendant of attempting to rob Ms. Richardson with a dangerous weapon, possessing Ms. Frick's brother's wallet, and possessing a stolen motor vehicle; and to fail to reach agreement with respect to the issue of whether Defendant robbed Ms. Frick's father and brother and attempted to rob Ms. Frick.

connection with Defendant's conviction for possession of stolen property, the trial court entered judgments sentencing Defendant to four consecutive active terms totaling thirty-two to thirty-nine months imprisonment, and one suspended term of six to eight months imprisonment, with Defendant being placed on supervised probation for a period of thirty-six months subject to certain terms and conditions. Defendant noted an appeal to this Court from the trial court's judgments.

## II. Legal Analysis

### A. Motion to Strike the State's Brief

As an initial matter, we must address Defendant's motion to strike the State's brief, which was filed in an untimely manner without any justification or excuse and after several extensions of the time within which it was authorized to do so had been obtained. Although the complete failure on the part of counsel for the State to comply with our rules concerning the timing within which the State's brief should have been filed is quite troubling and although we strongly admonish counsel for the State to refrain from engaging in such conduct in the future, we conclude that Defendant's dismissal motion should be denied for a number of reasons.

As an initial matter, we note that the filing of an appellee's brief, as compared to the filing of an appellant's

brief, is not a prerequisite for the perfection of an appeal. According to the relevant provisions of the North Carolina Rules of Appellate Procedure, while "the appeal may be dismissed" "[i]f an appellant fails to file and serve a brief within the time allowed," an appellee's failure to file his or her brief in a timely manner simply means that he or she may not "be heard in oral argument except by permission of the court." N.C.R. App. P. 13(c). For that reason, decisions such as *Thompson v. First Citizens Bank & Trust Co.*, 151 N.C. App. 704, 706, 567 S.E.2d 184, 186-87 (2002), and *Dalenko v. Wake Cnty. Dep't of Human Servs.*, 157 N.C. App. 49, 53-54, 578 S.E.2d 599, 602, *cert. denied*, 357 N.C. 457, 585 S.E.2d 383 (2003) *cert. denied sub nom Bennett v. Wake Cnty. Dep't of Human Servs.*, 540 U.S. 1178, 124 S. Ct. 1411, 158 L. Ed. 2d 79 (2004), in which this Court dismissed appeals based upon the appellant's failure to file a brief, shed little light on the proper resolution of this issue. As a result, since nothing in the relevant provisions of the North Carolina Rules of Appellate Procedure mandates the striking of the State's brief, we must evaluate the merits of Defendant's motion to strike based upon an analysis of the decisions governing the manner in which violations of the North Carolina Rules of Appellate Procedure should be sanctioned.

Although the Rules of Appellate Procedure "are mandatory and [the] failure to follow these rules will subject an appeal to dismissal," *Steingress v. Steingress*, 350 N.C. 64, 65, 511 S.E.2d 298, 299 (1999), "a party's failure to comply with nonjurisdictional rule requirements normally should not lead to dismissal of the appeal." *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 198, 657 S.E.2d 361, 365 (2008). Instead, N.C.R. App. P. 25(b) and N.C.R. App. P. 34 provide this Court with substantial discretion in determining an appropriate sanction in the event that a party commits a non-jurisdictional violation of the North Carolina Rules of Appellate Procedure.

Admittedly, a decision to strike a party's brief is not as significant as a decision to dismiss a party's appeal. However, striking an appellee's brief is among the most significant sanctions, if not the most significant, that can be imposed upon an appellee. For that reason, we are inclined to believe that an appellee's failure to file his or her brief in a timely manner should not, as a general proposition, result in the striking of that party's brief in the absence of a showing that the appellee's conduct has resulted in material prejudice to the appellant. Although the record clearly establishes that the State has completely failed to provide any legitimate excuse for

its failure to file its brief in a timely manner, the record also clearly establishes that Defendant has not demonstrated that he suffered any particularized prejudice as a result of the State's lack of timely action.  As a result, we hereby conclude, in the exercise of our discretion, that Defendant's motion to strike the State's brief should be, and hereby is, denied. Counsel for the State is, however, strongly admonished to refrain from engaging in such inexcusable conduct in the future and should understand that any repetition of the conduct disclosed by the present record will result in the imposition of significant sanctions upon both the State and himself personally.

### B. Substantive Legal Issues

### 1. Admissibility of Text Messages

In his brief, Defendant contends that the trial court erred by sustaining the State's objections to the admission of evidence concerning the contents of certain text messages obtained by investigating officers during an examination of Mr. Alston's cell phone.  More specifically, Defendant contends that the cell phone messages were relevant and properly authenticated and that the exclusion of the evidence in question prejudiced his chances for a more favorable outcome at trial.  We do not find Defendant's argument persuasive.

## a. Relevant Facts

The phone number listed on Loven McLaughlin's arrest report was (336) 263-9913. According to Loven McLaughlin, the investigating officers did not confiscate his cell phone at the time that he was taken into custody and never asked him to verify his phone number. In addition, Loven McLaughlin testified that he could not remember the cell phone number assigned to his phone as of the date upon which he was arrested given the large number of phones that he had utilized.

Although Detective Jennifer Bradley Matherly of the Burlington Police Department prepared Loven McLaughlin's arrest report, she acknowledged that the names, dates, phone numbers, and other information that she recorded on that document could have emanated from a range of sources, such as information provided by the suspect, information contained in the warrant for arrest, or information on file with or available to the Burlington Police Department. For that reason, Detective Matherly indicated that, while she could have confirmed a phone number shown on the arrest report with the suspect, she might have obtained that information in another way as well and did not know the source of any specific item of information shown on Loven McLaughlin's arrest report. Detective Matherly did state, however, that she would not have used information obtained from

one suspect in filling out an arrest report relating to a different suspect.

After recovering Mr. Alston's cell phone, investigating officers photographed each individual text message found in that instrument. During this process, investigating officers found messages sent to Mr. Alston from individuals identified as "LuvBoat" and "SnakeNDAGrass." Although Andre McLaughlin testified that Mr. Alston referred to Loven McLaughlin as "LuvBoat," Loven McLaughlin denied that Mr. Alston called him by that name and asserted, instead, that Mr. Alston called him "Slogey." In addition, Loven McLaughlin testified that he was not planning on moving, that he is not related to Mr. Alston, and that he and Mr. Alston never referred to each other as "cuz."

After Defendant began to cross-examine Loven McLaughlin about the text messages taken from Mr. Alston's phone, the State lodged a successful objection. Subsequently, during his own case in chief, Defendant sought to obtain the admission of the text messages in question. However, the trial court sustained the State's objection to the admission of these text messages. In both instances, the State's objections were predicated on authentication and relevance grounds.

The text messages sought to be introduced showed a callback number of (336) 263-9913. Without reciting the contents of these text messages in their entirety, certain messages that "LuvBoat" sent to Mr. Alston's phone contained repeated statements concerning "LuvBoat's" need for money in order "to find a place to stay," inquiring if "ur cuzin" was going to "sell it," and asking if Mr. Alston had "got the money." During the same time that he was receiving these text messages from "LuvBoat," messages were sent from Mr. Alston's phone to "Cuz" stating "u gta choppa" and "r u strap[p]ed." The undisputed evidence reflects that "choppa" is a reference to an assault rifle, while the fact that someone is "strapped" means that he or she is in possession of a weapon.

### b. Admissibility of Text Messages

According to well-established North Carolina law, the requirement that an item be properly authenticated before being admitted into evidence is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C. Gen. Stat. § 8C-1, Rule 901(a). "A trial court's determination as to whether a document has been sufficiently authenticated is reviewed *de novo* on appeal as a question of law." *State v. Crawley*, ___ N.C. App. ___, ___, 719 S.E.2d 632, 637 (2011), *disc. review denied*, 365 N.C. 553, 722

S.E.2d 607 (2012). Similarly, evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401. "Although '[a] trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to [N.C. Gen. Stat. § 8C-1,] Rule 403, such rulings are given great deference on appeal.'" *Dunn v. Custer*, 162 N.C. App. 259, 266, 591 S.E.2d 11, 17 (2004) (quoting *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991), *appeal dismissed*, 331 N.C. 290, 416 S.E.2d 398, *cert. denied*, 506 U.S. 915, 113 S. Ct. 321, 121 L. Ed. 2d 241 (1992)). "A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a).

Assuming, without deciding, that the text messages at issue in this case were properly authenticated and were relevant to the matters at issue at trial, we are unable to determine that there was a reasonable possibility that the outcome at Defendant's trial would have been different had these errors not

been committed. The ultimate effect of the jury's verdicts was to convict Defendant of breaking into Mr. May's apartment and stealing various electronic items and firearms and breaking into Mr. Pryor's motor vehicle and pointing an assault rifle at him. In attempting to persuade us that the exclusion of these text messages constituted prejudicial error, Defendant contends that these messages undercut the credibility of Loven McLaughlin's testimony by refuting his contention that he, rather than Defendant, was being forced to move and suggested that Loven McLaughlin had been involved in the theft of the firearms from Mr. May's apartment and their subsequent use in the commission of other offenses given his attempt to get Mr. Alston to sell the firearms taken at that time. Although the record might support the inferences that Defendant contends should be drawn from these text messages, those inferences have little strength.

As an initial matter, even if the record suffices to support an inference that the text messages from "LuvBoat" were sent by Loven McLaughlin, the record contains substantial evidence that would support a contrary inference. Secondly, the record contains no evidence concerning the identity of "Cuz," to whom the text messages concerning the firearms were sent. Thirdly, the text messages from "LuvBoat" simply inquire whether "ur cuzin [is] goin to sell it," which is less than a clear cut

reference to the sale of one or more firearms, much less those taken from Mr. May's apartment. Fourthly, the inference that the firearms referred to in the text messages to "Cuz" are the same weapons that had been taken from Mr. May's apartment is less than compelling. Finally, as the trial court noted, even if the text messages in question establish that Loven McLaughlin was involved in the entry into Mr. May's apartment, that fact, without more, does not exonerate Defendant of any involvement in the commission of that crime given the undisputed evidence that Defendant, Loven McLaughlin, Andre McLaughlin, and Mr. Alston were spending a great deal of time together during the time in which that crime was committed. As a result, the inference that Defendant wishes us to draw from the text messages in question is, at best, an ambiguous and equivocal one.

In addition, the record contains substantial additional evidence of Defendant's guilt. For example, the record contains the essentially undisputed testimony of Mr. May to the effect that Defendant was familiar with his property and that his apartment had been broken into and his property taken within a relatively short period of time after he and Defendant left the premises. In addition, Mr. Pryor identified Defendant as the individual who broke into his motor vehicle and pointed a rifle at him. Although the strength of Mr. Pryor's identification of

Defendant waned between the time of the investigation and the time of trial, that fact, standing alone, should not divert our attention from the fact that the jury heard evidence that Mr. Pryor was 90% certain that Defendant was the individual who had broken into his vehicle and pointed an assault rifle at him shortly after the commission of those crimes. In short, the other evidence of Defendant's guilt, while perhaps not overwhelming, was certainly strong. As a result, given the limited strength of the inferences that Defendant wishes us to draw from the text messages at issue in this case coupled with the relative strength of the State's other evidence of Defendant's guilt, we are unable to say that Defendant has shown that there is a reasonable possibility that the outcome at trial would have been different had the evidence in question been admitted at Defendant's trial. For that reason, we hold that Defendant is not entitled to an award of appellate relief based upon this challenge to the trial court's judgments.

## 2. Jury Instructions

Secondly, Defendant contends that the trial court erred by refusing to instruct the jury in accordance with his requested instruction relating to the manner in which it should consider the credibility of eyewitness identification evidence. More specifically, Defendant contends that the trial court should

have informed the jury about the results of recent research into factors bearing upon the accuracy of such evidence during its instructions to the jury. Defendant is not entitled to relief from the trial court's judgments on the basis of this contention.

## a. Standard of Review

"It is the duty of the trial court to instruct the jury on all substantial features of a case raised by the evidence." *State v. Shaw*, 322 N.C. 797, 803, 370 S.E.2d 546, 549 (1988). For that reason, a "[f]ailure [by the trial court] to instruct upon all substantive or material features of the crime charged is error." *State v. Bogle*, 324 N.C. 190, 195, 376 S.E.2d 745, 748 (1989). While "[i]t is well established in this jurisdiction that the trial court is not required to give a requested instruction in the exact language of the request," "when the request is correct in law and supported by the evidence in the case, the court must give the instruction in substance." *State v. Green*, 305 N.C. 463, 476-77, 290 S.E.2d 625, 633 (1982). This Court reviews issues relating to the substance of the trial court's instructions using a *de novo* standard of review. *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009).

## b. Applicable Background Information

In 2012, the New Jersey Supreme Court released a new pattern jury instruction addressing eyewitness identification issues[2] that was based upon its decision in *State v. Henderson*, 208 N.J. 208, 27 A.3d 872 (2011). In *Henderson*, the defendant contended "that the identification [of him as the culprit] was not reliable because the officers investigating the case intervened during the identification process and unduly influenced the eyewitness." 208 N.J. at 217, 27 A.3d at 877. During its consideration of *Henderson*, the New Jersey Supreme Court ordered that an evidentiary hearing be held for the purpose of evaluating whether the "assumptions and other factors reflected in the two-part" test set out in *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), and the five factors that must be considered in the course of applying that test remained "valid and appropriate in light of recent scientific and other evidence." *Id.* at 228, 27 A.3d at 884. On remand, the parties developed a record that included testimony from "seven experts and [contained] more than 2,000 pages of transcripts along with hundreds of scientific studies." *Id.* at 217-18, 27 A.3d at 877. In reviewing the resulting special master's report, the New Jersey Supreme Court determined "that

---

[2]*Supreme Court Releases Eyewitness Identification Criteria for Criminal Cases*, (19 July 2012), http://www.judiciary.state.nj.us/pressrel/2012/pr120719a.htm.

the scientific evidence considered at the remand hearing [was] reliable"; that, "based on the testimony and ample record developed at the hearing," "a number of system and estimator variables can affect the reliability of eyewitness identifications"; and that the "evidence offer[ed] convincing proof that the current test for evaluating the trustworthiness of eyewitness identifications should be revised." *Id.* at 218, 283-85, 27 A.3d at 877, 916-17.

After making these preliminary determinations, the New Jersey Supreme Court concluded that, "[t]o evaluate whether there is evidence of suggestiveness to trigger a [pretrial] hearing, courts should consider the following non-exhaustive list of system variables," including:

> 1. *Blind Administration*. Was the lineup procedure performed double-blind? If double-blind testing was impractical, did the police use a technique like the "envelope method" . . . to ensure that the administrator had no knowledge of where the suspect appeared in the photo array or lineup?
>
> 2. *Pre-identification Instructions*. Did the administrator provide neutral, pre-identification instructions warning that the suspect may not be present in the lineup and that the witness should not feel compelled to make an identification?
>
> 3. *Lineup Construction*. Did the array or lineup contain only one suspect embedded among at least five innocent fillers? Did

the suspect stand out from other members of the lineup?

4.  *Feedback*.  Did the witness receive any information or feedback, about the suspect or the crime, before, during, or after the identification procedure?

5.  *Recording Confidence*.  Did the administrator record the witness' statement of confidence immediately after the identification, before the possibility of any confirmatory feedback?

6.  *Multiple Viewings*.  Did the witness view the suspect more than once as part of multiple identification procedures?  Did police use the same fillers more than once?

7.  *Showups*.  Did the police perform a showup more than two hours after an event?  Did the police warn the witness that the suspect may not be the perpetrator and that the witness should not feel compelled to make an identification?

8.  *Private Actors*.  Did law enforcement elicit from the eyewitness whether he or she had spoken with anyone about the identification and, if so, what was discussed?

9.  *Other Identifications Made*.  Did the eyewitness initially make no choice or choose a different suspect or filler?

*Id.* at 289-91, 27 A.3d at 920-21.  In addition, the New Jersey Supreme Court held that, in order to determine whether an identification was valid, courts should consider particular "estimator" variables, including:

1.  *Stress*.  Did the event involve a high level of stress?

2. *Weapon focus*. Was a visible weapon used during a crime of short duration?

3. *Duration*. How much time did the witness have to observe the event?

4. *Distance and Lighting*. How close were the witness and perpetrator? What were the lighting conditions at the time?

5. *Witness Characteristics*. Was the witness under the influence of alcohol or drugs? Was age a relevant factor under the circumstances of the case?

6. *Characteristics of Perpetrator*. Was the culprit wearing a disguise? Did the suspect have different facial features at the time of the identification?

7. *Memory decay*. How much time elapsed between the crime and the identification?

8. *Race-bias*. Does the case involve a cross-racial identification?

Some of the above estimator variables overlap with the five reliability factors outlined in *Neil v. Biggers*, *supra*, 409 U.S. at 199-200, 93 S. Ct. at 382, 34 L. Ed. 2d at 411, which we nonetheless repeat:

9. *Opportunity to view the criminal at the time of the crime*.

10. *Degree of attention*.

11. *Accuracy of prior description of the criminal*.

12. *Level of certainty demonstrated at the confrontation*.

Did the witness express high confidence at the time of the identification before receiving any feedback or other information?

13. *The time between the crime and the confrontation*. (Encompassed fully by "memory decay" above.)

*Id.* at 291-92, 27 A.3d at 921-22. After describing the manner in which the trial courts should evaluate the admissibility of eyewitness identification testimony, the New Jersey Supreme Court noted that "juries will continue to hear about all relevant system and estimator variables at trial, through direct and cross-examination and arguments by counsel"; directed that "enhanced instructions be given to guide juries about the various factors that may affect the reliability of an identification in a particular case" "[b]ased on the record developed on remand"; and created a process under which various committees would draft proposed revisions to the existing pattern instructions relating to the validity of eyewitness identification evidence based upon the determinations set out in the *Henderson* opinion for its consideration. *Id.* at 296, 298-99, 27 A.3d at 924-26.[3]

c. Defendant's Requested Eyewitness Identification Instruction

---

[3]The pattern instructions are available in full at http://www.judiciary.state.nj.us/pressrel/2012/jury_instruction.pdf.

The eyewitness identification instruction that Defendant requested the trial court to deliver in this case was eight pages long and contained language that bore a strong resemblance to the New Jersey instruction developed as a result of the *Henderson* decision. Among other things, Defendant requested the trial court to instruct the jury that "there are risks of making mistaken identifications" and that the jury should consider a number of factors in evaluating the credibility of the eyewitness identification testimony presented in this case, including, among other things, the witness' "opportunity to view the person who committed the offense"; the witness' "level of stress," given that high levels of stress can reduce an eyewitness's ability to recall; "[t]he amount of time [the witness had] to observe an event"; whether the "witness saw a weapon during the incident," since "the presence of a visible weapon may reduce the reliability of a subsequent identification"; the distance between the witness and the person being identified; the adequacy of the lighting conditions at the time that the witness saw the perpetrator; the extent to which the witness' level of intoxication "affect[ed] the reliability of the identification"; the possible use of a disguise; the "accuracy of any description [that] the witness gave after observing the incident and before identifying the perpetrator";

the degree to which the witness is confident about the accuracy of his or her identification, subject to the caveat that an "eyewitness's confidence is generally an unreliable indicator of accuracy"; the extent to which there have been "delays between the commission of a crime and the time an[] identification is made"; and, since "[r]esearch has shown that people may have greater difficulty in accurately identifying members of a different race," whether the witness and the alleged perpetrator are of the same or different races. In addition, Defendant's proposed instruction informed the jury that, in considering the reliability of any identification procedure described in the record, the jury should consider whether any person stood "out from other members of the lineup"; whether a minimum of "six persons or photos" had been included in the lineup; whether the witness viewed the suspect in multiple lineups, since "the risk of mistaken identification is increased" "if a witness views an innocent suspect in multiple identification procedures"; whether the witness identified the suspect in a show-up, since "show ups conducted more than two hours after an event present a heightened risk of misidentification"; whether the line-up administrator knew the suspect's identity; what was said to the witness prior to viewing a lineup or photographic array; and whether "police officers or witnesses to an event who are not

law enforcement officials[] signal to eyewitnesses that they correctly identified the suspect."

d. Trial Court's Eyewitness Identification Instruction

The trial court declined to give the eyewitness identification instruction that Defendant requested and, instead, instructed the jury that:

> You, ladies and gentlemen, are the sole judges of the credibility and the believability of each and every witness, that is their worthiness of belief. You must decide for yourselves whether to believe the testimony of any witness, or you may believe all or any part or none of what a witness has said on the witness stand.
>
> In determining whether to believe any witness, you should apply the same tests of truthfulness which you do apply in your own everyday affairs. As applied to this trial, these tests may include the opportunity of the witness to see, hear, know or remember the facts or occurrence about which the witness testified; the manner and the appearance of the witness; any interest, bias or prejudice the witness may have; the apparent understanding and fairness of the witness; whether the witness's testimony is reasonable and whether such testimony is consistent with other believable evidence in the case.
>
> You are the sole judges of the weight to be given to any evidence. By this I mean, if you decide that certain evidence is believable, you must then determine the importance of that evidence in light of all other believable evidence in the case.
>
> . . . .

> I instruct you that the State has the burden of proving the identity of the defendant as the perpetrator of the crime charged beyond a reasonable doubt. This means that you, the jury, must be satisfied beyond a reasonable doubt that the defendant was the perpetrator of the crime charged before you may return a verdict of guilty.

In addition, the trial court delivered the instruction relating to the manner in which the jury should evaluate the validity of photographic identification procedures as required by N.C. Gen. Stat. § 15A-284.52(d)(3), with this instruction having included a lengthy recitation of the criteria for a proper identification procedure set out in N.C. Gen. Stat. § 15A-284.52(b). We do not believe, given the record developed before the trial court in this case and the content of the instructions actually delivered by the trial court, that the trial court erred by declining to deliver Defendant's requested eyewitness identification instruction.

### e. Relevant Appellate Decisions

The appellate courts in this jurisdiction have addressed the appropriateness of delivering additional instructions concerning the credibility of eyewitness identification testimony on a number of occasions. In *State v. Green*, the defendant requested the trial court to instruct the jury to consider the mental state of the witness and the adequacy of the witness' eyesight in evaluating the credibility of the

eyewitness identification testimony. 305 N.C. at 475-76, 290 S.E.2d at 633. In lieu of delivering the instruction requested by the defendant, the trial court instructed the jury in accordance with the pattern jury instructions addressing the weight and credibility of the evidence and the necessity for the jury to find beyond a reasonable doubt that the defendant was the perpetrator of the crime charged before returning a verdict of guilty. *Id.* at 476, 290 S.E.2d at 633. In reviewing the defendant's challenge on appeal to the trial court's refusal to deliver his requested instruction, the Supreme Court held that the instructions delivered by the trial court, considered as a whole, were "adequate[] [to] explain[] to the jury the various factors they should consider in evaluating the testimony of witnesses." *Id.* at 477, 290 S.E.2d at 633.

Similarly, in *State v. Dodd*, 330 N.C. 747, 752, 412 S.E.2d 46, 49 (1992), the defendant requested the trial court to instruct the jury in such a manner as to "emphasize[] at length the jury's need to examine the testimony of the witnesses to assess whether they had the opportunity to observe the alleged crime, their ability to identify the perpetrator given the length of time they had to observe, their mental and physical conditions, and the lighting and other conditions that might have affected their observation." Although these instructions

focused on a somewhat different set of factors than were addressed in the requested instruction at issue in *Green*, the Supreme Court upheld the trial court's decision to refrain from delivering the instruction requested by the defendant and to utilize the pattern jury instructions concerning the weight and credibility of the evidence and the necessity for the jury to find beyond a reasonable doubt that the defendant was the perpetrator of the crime charged before returning a guilty verdict on the grounds that the instructions actually delivered by the trial court adequately informed the jury about the factors that should be considered in evaluating the credibility of eyewitness identification testimony. *Id.* at 753, 412 S.E.2d at 49.

An examination of the Supreme Court's decisions in *Green* and *Dodd*, coupled with our similar decision in *State v. Summey*, 109 N.C. App. 518, 525-26, 428 S.E.2d 245, 249-50 (1993) (holding that the trial court did not err by failing to instruct the jury to consider certain additional factors in evaluating the validity of eyewitness identification testimony), reveals that this Court and the Supreme Court have clearly held that the existing pattern jury instructions governing the manner in which jurors should evaluate the weight and credibility of the evidence and the necessity for the jury to find that the

defendant perpetrated the crime charged beyond a reasonable doubt sufficiently address the issues arising from the presentation of eyewitness identification testimony. In recognition of these decisions, Defendant contends that, while the weight, credibility, and identity instructions held to be adequate in *Green* and *Dodd* are sufficient in cases, such as those involving poor lighting, distance, or intoxication, in which the alleged deficiencies in an eyewitness identification should be obvious, they do not suffice to provide jurors with adequate information concerning more subtle and less obvious deficiencies in eyewitness identification evidence. In support of this argument, Defendant relies upon the logic set out in *Henderson*, in which the New Jersey Supreme Court stated, among other things, that, while "[e]veryone knows, for instance, that bad lighting conditions make it more difficult to perceive the details of a person's face," other "findings are less obvious," with many people clearly believing that "witnesses to a highly stressful, threatening event will 'never forget a face' because of their intense focus at the time, the research suggests that is not necessarily so." *Henderson*, 208 N.J. at 272, 27 A.3d at 910. As a result, Defendant essentially argues that we should treat *Green*, *Dodd*, and *Summey* as distinguishable based upon the

nature of the factors addressed in the requested instructions deemed unnecessary there.

Assuming, without deciding, that the distinction upon which Defendant relies is a valid one, a point that we need not address in this instance, we do not believe that the additional instruction that Defendant requested in this case had adequate evidentiary support. In essence, the difference between the instructions that the trial court delivered and the instruction that Defendant requested is that the latter, unlike the former, contained numerous factual statements about the impact of weapons, focus, stress, racial differences, and the degree of certainty expressed by the witness in identifying the defendant as the perpetrator. For example, the effect of a decision to deliver Defendant's requested instruction would put the trial courts in the position of making numerous factual statements about the impact of various factors on the validity of eyewitness identification testimony, such as assertions that "[t]he process of remembering consists of three stages"; that "research has shown that there are risks of making mistaken identifications"; that "[r]esearch has revealed that human memory is not like a video recording"; that "the presence of a visible weapon may reduce the reliability of a subsequent identification if the crime is of short duration"; that an

"eyewitness's confidence is generally an unreliable indicator of accuracy"; and that "[r]esearch has shown that people may have greater difficulty in accurately identifying members of a different race." Although the record developed in *Henderson* contained evidence relating to these issues, there is no such evidence in the present record and Defendant has not argued, much less established, that we are entitled to take judicial notice of the information upon which the *Henderson* Court relied in adopting the pattern instruction upon which Defendant relies. *West v. G. D. Reddick, Inc.*, 302 N.C. 201, 203, 274 S.E.2d 221, 223 (1981) (stating that, "generally a judge or a court may take judicial notice of a fact which is either so notoriously true as not to be the subject of reasonable dispute or is *capable of demonstration by readily accessible sources of indisputable accuracy*"). As a result, a decision to reverse the trial court for failing to deliver Defendant's requested instruction relating to the credibility of eyewitness identification testimony would, in essence, put this Court in the position of making factual determinations and exercising rule-making authority, neither of which we have the authority to do. *Shera v. N.C. State Univ. Veterinary Teaching Hosp.*, __ N.C. App. __, __, 723 S.E.2d 352, 358 (2012) (holding that "[t]his Court is an error-correcting court, not a law-making court"). As a result,

we hold, in light of the previous decisions of the Supreme Court and this Court, by which we are bound; the absence of any evidentiary support for the instruction that Defendant contends that the trial court should have delivered; and the well-established limitations under which this Court operates, that the trial court did not commit prejudicial error by failing to give Defendant's requested instruction concerning the manner in which the jury should evaluate the credibility of the eyewitness identification testimony presented for its consideration.

## III. Conclusion

Thus, for the reasons set forth above, we conclude that neither of Defendant's challenges to the trial court's judgments have merit. As a result, the trial court's judgments should, and hereby do, remain undisturbed.

NO ERROR.

Chief Judge MARTIN and Judge MCCULLOUGH concur.