STATE OF NORTH CAROLINA v. DAVID W. GREEN

No. 159A81

(Filed 4 May 1982)

**1. Criminal Law § 89.3— corroboration—prior consistent statements**

A nurse properly corroborated testimony that the prosecutrix told her that she had been raped although the prosecutrix did not testify that she had talked to the nurse. Furthermore, the trial court did not err in permitting the daughter of the prosecutrix to state for corroborative purposes that her mother had told her twice that she had been raped.

2. **Criminal Law § 68; Rape § 4— hair found on rape victim—comparison with defendant's hair**

An expert on hair identification and comparison was properly permitted to testify that a pubic hair found on the body of a rape victim which did not originate from her had the same microscopic characteristics as pubic hair taken from defendant and therefore could have come from the defendant.

3. **Criminal Law § 68; Rape and Allied Offenses § 4— identification of bite mark on rape victim**

An expert in forensic odontology and bite mark identification was properly permitted to state his opinion that a bite mark on a rape victim's arm was made by defendant based on his comparison of a photograph of the bite mark and impressions which he made of defendant's teeth.

4. **Burglary and Unlawful Breakings § 1— first degree burglary—storage room as part of dwelling house**

A storage room from which defendant stole a motorcycle was "appurtenant" to the victim's main dwelling and was thus a part of the victim's "dwelling house" within the purview of the first degree burglary statute, G.S. 14-51, where the storage room had been built at the back of the house just behind a bedroom occupied by the owner's mother; the storage room could be entered through an outside door or through a window in the bedroom; and defendant in fact did crawl through the bedroom to reach the storage room.

5. **Larceny § 7.1— proof of intent**

In a prosecution for larceny of a motorcycle, the State's evidence was sufficient to support a jury finding that defendant took the motorcycle in order to provide a means of escape after committing a rape and that he intended to keep the motorcycle permanently, although defendant's testimony that he went to the victim's home to borrow the motorcycle to ride home would have supported a contrary finding.

6. **Larceny § 7.2— ownership of property stolen**

The evidence in a larceny case was sufficient to support a finding that a stolen motorcycle was the "personal property of Robert Allen in the custody and possession of Margaret Osborne" as alleged in the indictment. However, even if there were no evidence that Robert Allen owned the motorcycle, the allegation and proof that the motorcycle was in Osborne's custody and possession was sufficient to support the charge of larceny.

7. **Criminal Law § 111.1— identification testimony—failure to give requested instructions**

The trial court did not err in failing to give defendant's tendered instruction concerning a rape victim's observation and identification of defendant where the instructions given by the court clearly emphasized the importance of proper identification of the defendant, emphasized that the burden of proving such identity beyond a reasonable doubt was on the State, adequately explained the various factors the jury could consider in evaluating the testimony of witnesses, and gave in substance that portion of the requested instruction which was correct in law.

**8. Rape and Allied Offenses § 6.1— first degree rape—infliction of serious personal injury—instructions on lesser degrees of crime not required**

In a prosecution for first degree rape pursuant to G.S. 14-27.2 which requires, *inter alia,* infliction of serious personal injury upon the victim, the evidence would not permit a jury finding that the victim did not suffer serious personal injury so as to require the court to submit the lesser included offenses of second degree rape and attempted second degree rape where the evidence established that the victim was severely beaten, resulting in multiple contusions and a large bite on her arm, multiple abrasions on her face, a one and one-half inch long laceration on the left side of her scalp, abrasions on both legs, and fractured ribs on her left side.

BEFORE *Braswell, Judge,* at the 29 June 1981 Criminal Session of Superior Court, CUMBERLAND County.

In a bill of indictment, proper in form, defendant was charged in separate counts with first degree burglary, first degree rape and felonious larceny. He was tried before a jury and was found guilty of each charge. He received sentences of life imprisonment for the rape and burglary convictions and of ten years' imprisonment for the larceny conviction. Defendant appeals the life sentences to this Court as a matter of right. On 15 December 1981 we allowed his motion to bypass the Court of Appeals to review the larceny conviction.

*Attorney General Rufus L. Edmisten, by Special Deputy Attorney General Isham B. Hudson, Jr., for the State.*

*Assistant Public Defender James R. Parish for the defendant.*

CARLTON, Justice.

I.

At trial, evidence for the State tended to show that on the night of 26 August 1980 Mary Shaw, a seventy-eight-year-old female, awoke from her sleep and saw a man standing in the doorway to her bedroom. Mrs. Shaw lived with her daughter and grandson in her daughter's home, but she was alone in the house that night. She recognized the intruder as the defendant, David Green, a friend of her grandson's. Defendant walked to her bed and hit her on the side of her head. He dragged her from the bed, forced her to the floor, and raped her. During the struggle, Mrs. Shaw begged him not to do it and called for her daughter. De-

fendant told her that if she didn't keep quiet he would kill her. Mrs. Shaw did not remember when or how defendant left the house.

After defendant left, Mrs. Shaw crawled into the living room, where she remained until found by her daughter, Margaret Osborne, shortly after midnight. When Ms. Osborne entered her home, she discovered her mother lying nude on the living room floor. Mrs. Shaw told her what had happened, and Ms. Osborne called the police. Ms. Osborne went into her mother's bedroom and saw blood on the floor and on the bed. She found her mother's nightgown at the foot of the bed. It, too, had blood on it. She later discovered that the storm window and screen had been removed from the window above her mother's bed. The storm window and screen were found under Mrs. Shaw's bed.

The window above Mrs. Shaw's bed opened into the storage room, where Terry Allen, Ms. Osborne's son, stored his two motorcycles. One of these, a Honda 70L, was missing from the storage room. The storage room was locked when Ms. Osborne left her home shortly after nine o'clock that evening. She had the only key. When Ms. Osborne left the house was locked and, when she returned, the side door was ajar.

After calling the police Ms. Osborne called defendant's home and spoke with his mother. She was told that defendant was not at home. Defendant called back a few minutes later and told Ms. Osborne that he "didn't do it" but that he had gone to her house and gotten a motorcycle from the storage room. He denied having gone into the house.

Mrs. Shaw was taken to the hospital. She was examined the next morning by Dr. Neil A. Worden. When Dr. Worden saw her, she appeared to have been beaten. There was a laceration on the right side of her scalp, and she had multiple contusions. On her left arm was a large bite mark. On the left side of her scalp was a laceration, measuring one and one-half inches in length. Both of her legs had abrasions. Dr. Worden discovered considerable bruising of the vulva, indicating severe trauma and found that her vagina was full of old, dark blood, although no gross lacerations were noted. X-rays revealed that several ribs on her left side were fractured.

Other evidence presented by the State tended to show that a fingerprint found on the storm window was made by the left middle finger of the defendant and that the bite mark on Mrs. Shaw's left arm was made by the defendant.

Susan Griffin of the Fayetteville City Police Department, an expert in fingerprint analysis and identification, testified that a latent fingerprint found on a storm window which had been placed under the bed in Mrs. Shaw's room was made by the left middle finger of the defendant. Dr. William P. Webster, qualified as an expert witness in forensic odontology, testified that bite marks photographed on Mrs. Shaw were made by the defendant.

Detective Sergeant E. E. Wiggs of the Cumberland County Sheriff's Department testified that he questioned the defendant after his arrest. After defendant was advised of his *Miranda* rights and had waived them, defendant stated that he had gone to the Osborne residence earlier that evening and had taken the motorcycle from the unlocked storage room. He initially denied having been inside the residence. Defendant then told Detective Wiggs that he had gone to the residence, entered it through an unlocked door and saw Mrs. Shaw lying nude on the floor. She called to him for help, but he did not go to her. Instead, he went down the hallway into Mrs. Shaw's bedroom and removed the storm window and screen from the window. He climbed through the window into the storage room, unlocked the storage room door, and left with the motorcycle. After being told that his story was not believable, defendant again denied hitting Mrs. Shaw but then admitted that he had in fact pulled her from the bed and had had sexual intercourse with her on the floor in the bedroom. He told Detective Wiggs that the motorcycle he had taken was at his home. Defendant was sixteen years of age at the time.

Evidence for the defendant tended to show that he was out drinking beer and smoking marijuana with some friends on the evening of 26 August 1980. Defendant testified that he drank about three and one-half six-packs. Defendant later rode a bicycle to the Osborne residence. He testified that he went to get the motorcycle and, upon arriving at the house, knocked on the door and entered. He saw Mrs. Shaw lying on the floor and sat her up against the wall of the bedroom and then left through the storage room window. He removed the storm window but did not take the screen off. He went into the storage room, took the motorcycle,

and, as he was leaving the backyard, heard a man's voice coming from the house. He went back toward the house and collided with a man who was coming out of the house. He recognized the man as "Steve," a man who defendant had been riding with earlier that evening. Steve threatened to kill defendant if defendant said anything. Defendant then left on the motorcycle and returned to his home. His mother told him to call the Osborne residence. He did so and denied the incident. Shortly after he talked to Ms. Osborne the police arrived and arrested him. He admitted to the police that he took the motorcycle but told them he did not rape Mrs. Shaw. He had been to the Osborne residence many times as a friend of Terry Allen. The first time he told anyone about seeing Steve leave the Osborne residence was while he was in jail when he told his brother and mother. Defendant testified that he did not know where Steve was.

Defendant's mother, Sandra Green, testified that defendant had been riding with Steve Craig and others earlier that evening. She saw them several times when they stopped at her house. Defendant returned home alone at 10:20 p.m. He was on a motorcycle. According to Mrs. Green, defendant was acting "crazy," and kept saying "that dude is going to kill me." She had never before seen defendant act this way. He had blood on his shirt and, after changing his clothes, left on the motorcycle.

Other evidence pertinent to this opinion will be noted below.

## II.

### A.

[1] Defendant first contends that the trial court erred in admitting certain corroborative testimony. A nurse on duty in the emergency room when Mrs. Shaw was brought to the hospital and the victim's daughter both testified, over objection, that the victim had told them that she had been raped. Ms. Osborne twice made this statement. In each instance, the trial court instructed the jury that the question and answer would be competent only for the purpose of corroborating the testimony of Mrs. Shaw. Defendant argues that the nurse's corroborative testimony should not have been allowed because Mrs. Shaw never testified that she had talked to the nurse and that allowing Ms. Osborne to so testify twice was improper because it sought to establish credibility by mere repetition.

Defendant's contention is plainly without merit. Testimony that a witness made a prior consistent statement is admissible as evidence tending to strengthen the witness's credibility. *E.g., State v. Mayhand,* 298 N.C. 418, 259 S.E. 2d 231 (1979); *State v. Medley,* 295 N.C. 75, 243 S.E. 2d 374 (1978). It is not a precondition to the admission of corroborative testimony for the witness to have testified that any statement was made to the corroborating witness. *State v. Norwood,* 303 N.C. 473, 483, 279 S.E. 2d 550, 556 (1981). Moreover, we can see no error in allowing Ms. Osborne to state that her mother told her twice that she, the mother, had been raped.

Mrs. Shaw testified that the defendant had raped her. Both the nurse and Ms. Osborne corroborated this testimony by testifying that Mrs. Shaw made the statements to them shortly after the occurrence. Such testimony was clearly admissible as corroborative testimony of a prior consistent statement and there was no error in its admission.

This assignment of error is overruled.

B.

[2] Defendant next contends that the trial court erred in failing to allow his motion to exclude the testimony of a forensic chemist who testified as an expert on hair identification and comparison. Pubic hair combings were taken from both Mrs. Shaw and the defendant. The chemist testified that his examination of the pubic hair combing from Mrs. Shaw revealed a pubic hair which did not originate from her. He compared this pubic hair to the known pubic hair of defendant and found it to be microscopically consistent and "accordingly this hair could have originated from him [defendant]."

Defendant contends that this testimony was improperly admitted because it fails to present reliable, relevant and nonprejudicial evidence. Defendant notes that the chemist testified that neither the age nor sex of the person from whom the hair came could be determined, that he could not tell how or when the hair was deposited, and that he could not positively state that the hair came from the defendant to the exclusion of all other persons of the same race and hair color as defendant. Defendant also argues that the state of the art of hair analysis has not reached an adequate level of certainty to permit this testimony.

It is unnecessary to discuss the state of the art in hair analysis. "Testimony is relevant if it reasonably tends to establish the probability or the improbability of a fact in issue," *State ex rel. Freeman v. Ponder*, 234 N.C. 294, 304, 67 S.E. 2d 292, 300 (1951), the weight of the evidence being an issue for the jury, *e.g.*, *State v. Hamilton*, 264 N.C. 277, 141 S.E. 2d 506 (1965), *cert. denied*, 384 U.S. 1020 (1966). This Court has previously approved of testimony similar to that employed in the case before us, *State v. Barber*, 278 N.C. 268, 179 S.E. 2d 404 (1971), and we are not inclined to reverse that holding.

The testimony here was clearly relevant. It demonstrated that the hair found on Mrs. Shaw came from a person of defendant's race and hair color and therefore *could have* come from defendant. The testimony was merely another link in the chain of evidence presented by the State to establish that defendant was the perpetrator of the crime, and was properly submitted to the jury for its consideration.

We note also that the trial court read to the jury a cautionary instruction prepared by defense counsel. The court stated to the jury, "at most, in law, analysis of hair samples tends to identify the defendant as belonging to the class which the person whose hair sample he analyzed belonged. It is for you, the jury, to give such weight and credibility to this evidence as you determine is appropriate."

This assignment of error is overruled.

C.

[3] Grouping his next four contentions into one, defendant challenges the trial court's allowance of testimony from Dr. William Webster, an expert in the field of forensic odontology in bite mark identification. Dr. Webster testified that, based on his experience of examining the teeth of thousands of individuals for over twenty years, it was his opinion that each individual has distinctive dental characteristics of size, shape and arch form which cause each person to have a unique and distinctive set of teeth. Dr. Webster had been asked to determine whether the bite mark on the victim's arm had been made by defendant. Dr. Webster was given a picture of Mrs. Shaw's left arm, on which the bite mark appeared. He determined that the picture of the

arm was an approximate one-to-one scale representation of the actual arm and bite mark. Dr. Webster made impressions of defendant's upper and lower teeth and from these impressions made a plaster cast of defendant's teeth. A plastic overlay was placed over the plaster casts to mark the points of contact to form a representation of defendant's bite mark. The plastic overlays were compared to the bite mark depicted in the photograph. Based on this comparison, Dr. Webster testified that, in his opinion, the bite mark depicted in the photograph had been made by the defendant.

This Court recently approved for the first time the admission of expert testimony concerning the identity of the person who made a bite mark. In *State v. Temple*, 302 N.C. 1, 273 S.E. 2d 273 (1981), Justice Copeland, writing for the Court, reviewed the law in the several jurisdictions and held that such scientific evidence was properly admissible. Defendant acknowledges our recent holding but requests that we either reconsider it or distinguish it from the facts in the case at bar. Suffice it to say that we are presented with no persuasive reason to reconsider the holding in *Temple*, nor do we find it distinguishable.

The factual distinction urged by defendant is that in the instant case the expert formed his opinion on the basis of a comparison of defendant's dental impressions and a photograph of the victim's wound. In the leading case in this area, *People v. Marx*, 54 Cal. App. 3d 100, 126 Cal. Rptr. 350 (1975), a cast of the actual wound was used for the comparison. We disagree with defendant that this distinction precludes the admissibility of this testimony. The record before us reveals that a photograph of Mrs. Shaw's arm was made to approximate scale, with only a 0.4 millimeter discrepancy. Dr. Webster compared the enlarged photograph with the dental impression which he had made of defendant. Some fourteen common points of identification between defendant's teeth and the bite mark in the photograph were identified. We find no reason to suspect that the methodology employed by this expert witness was anything less than scientifically sound and reliable. We hold that this testimony was properly admitted.

We also note that the methodology here employed has been approved in other jurisdictions: *State v. Sager*, 600 S.W. 2d 541 (Mo. Ct. App. 1980), *cert. denied*, 450 U.S. 910 (1981); *People v.*

*Smith*, 443 N.Y.S. 2d 551, 110 (Misc. 2d 118) (1981); *State v. Jones*, 273 S.C. 723, 259 S.E. 2d 120 (1979).

D.

[4]   By his eighth and nineteenth assignments of error defendant contends that the trial court erred in not granting his motion to dismiss the charge of first degree burglary on the grounds of insufficiency of the evidence and in denying his motion to set aside the verdict for first degree burglary. Defendant bases his contentions on the location of the storage room from which the motorcycle was taken. Specifically, he argues that the storage room was not within the "dwelling house or sleeping apartment" as required by G.S. 14-51, the first degree burglary statute. Defendant argues that the storage room, the scene of the larceny, was only within the curtilage of the dwelling house and his crime, if any, was second degree burglary, G.S. 14-51. The curtilage of a dwelling house, defendant contends, is covered only by second degree burglary.

We agree with defendant that the breaking and entering of a building located away from the dwelling house with intent to commit a felony therein does not constitute first degree burglary. However, the definition of a "dwelling house" is not limited to the house proper. As this Court stated in *State v. Jake*:

> The term "dwelling-house" includes within it not only the house in which the owner or renter and his family, or any member of it, may live and sleep, but all other houses appurtenant thereto, and used as part and parcel thereof, such as kitchen, smokehouse, and the like: provided they are within the curtilage, or are adjacent or very near to the dwelling-house. *S. v. Langford, ubi supra; S. v. Whit*, 49 N.C., 349. If the kitchen, smokehouse, or other house of that kind be placed at a great distance from the dwelling, and particularly if it stand outside of the curtilage or inclosed [sic] yard, it cannot be considered a part of the dwelling-house for the purpose of being protected against a burglary. The reason is that the law protects from unauthorized violence the dwelling-house and those which are appurtenant, because it is the place of the owner's *repose*; and if he choose to put his kitchen or smokehouse so far from his dwelling that his *respose* is not likely to be disturbed by the breaking into it at night, it is his own folly. In such cases the law will no

more protect him than it will when he leaves his doors or windows open. *S. v. Langford, ubi supra.*

60 N.C. (Win.) 471, 472-73 (1864). Our review of the record before us discloses that the storage room in question was "appurtenant" to the main dwelling. Ms. Osborne testified that the storage room had been built at the back of the house just behind the bedroom occupied by her mother. The storage room could be entered through an outside door or through a window in her mother's bedroom. The evidence discloses that defendant did indeed crawl through the bedroom to reach the storage room, and that he, in fact, entered the dwelling house with the intent to commit a felony therein.

These assignments of error are overruled.

## E.

By his ninth and twenty-first assignments of error, defendant contends that the trial court erred in not granting his motion to dismiss the charge of larceny on the grounds of insufficiency of the evidence and in denying his motion to set aside the verdict for larceny. Defendant argues that (1) there was no evidence of the essential element of larceny that defendant intended permanently to deprive the owner of possession of the motorcycle, and (2) there was a fatal variance between the allegations of ownership in the indictment and the evidence introduced at trial. We disagree.

[5] Defendant bases his first argument primarily on his own testimony that he went to the Osborne home to borrow the motorcycle to ride home, that he did borrow the motorcycle and that he later told Ms. Osborne on the telephone that he had the motorcycle. It was found at his home the next day. We agree with defendant that the jury could have found that he did not intend permanently to deprive the owner of possession of the motorcycle. Likewise, it is clear that the jury could, as it did, find that defendant did intend to keep the motorcycle permanently. The jury could clearly have found from the evidence that defendant took the motorcycle in order to provide a means of escape and defendant's own witness testified that defendant stated that he had to "get out of here" immediately in order to keep from being killed. He was later seen by his family fleeing on the motorcycle. This portion of defendant's contention is plainly without merit.

[6]   Likewise, we find no fatal variance between the bill of indictment and the evidence introduced at trial. The indictment charged that the motorcycle was "the personal property of Robert Allen in the custody and possession of Margaret Osborne." Clearly, the motorcycle was in the custody and control of Ms. Osborne. At the time of the incident, the motorcycle was in a locked storage room at her residence and she had possession of the only key to the room.

Nor is there a fatal variance between the indictment's allegation of ownership and that shown at trial. The record discloses that the motorcycle was purchased by Robert Allen, Terry Allen's father, in 1975. The motorcycle was kept in Lumberton at the home of Robert Allen until some three or four months prior to this incident, when Ms. Osborne brought it to Fayetteville. Based on the foregoing and the fact that Terry was only fifteen years of age at the time of trial, we disagree with defendant that the evidence showed conclusively that Terry Allen was the owner of the motorcycle.

Additionally, even if there were no evidence that Robert Allen owned the motorcycle, there would still be no fatal variance. In *State v. Smith*, 266 N.C. 747, 147 S.E. 2d 165 (1966), the indictment alleged that defendant committed felonious larceny of a pistol owned by Griggs. At trial, the evidence showed that the pistol belonged to Griggs's daughter but that the pistol was under his custody and control. This Court rejected defendant's claim that a fatal variance existed between the indictment and the proof, stating that Griggs's interest as the custodian and controller of the gun was sufficient to obviate a variance. Although the variance here, if any, is not the same as in *Smith*, the basic principle applies. The indictment here alleged that the motorcycle was under Osborne's control and was in her possession; the evidence at trial tended to show these facts. The allegation of ownership in the indictment, thus, was unnecessary to the charge and was mere surplusage. *See State v. Greene*, 289 N.C. 578, 223 S.E. 2d 365 (1976); *State v. Richardson*, 8 N.C. App. 298, 174 S.E. 2d 77 (1970).

These assignments of error are overruled.

### F.

Grouping four of his contentions into one argument, defendant contends that the trial court erred in failing to instruct the jury (1) that if it found that the motorcycle belonged to Terry Allen the State would have failed to prove an element of the offense of larceny, (2) that if it found prior consent the State would have failed to prove an element of the offense of larceny, (3) that if it found that defendant took the motorcycle for transportation to his home but without intent permanently to deprive the owner of possession, the State would have failed to prove an element of the offense of larceny, and (4) that if the defendant mistakenly believed he was permitted to use the bicycle when he wanted, the State would have failed to prove an element of the offense of larceny.

The trial court instructed the jury that in order to find defendant guilty of felonious larceny it must find beyond a reasonable doubt that (1) the defendant took a Honda motorcycle belonging to Robert Allen which was in Ms. Osborne's custody and possession, (2) that defendant carried the motorcycle away, (3) that Ms. Osborne did not consent to the taking, (4) that at the time of the taking defendant intended permanently to deprive the possessor of the motorcycle, (5) that defendant knew he was not entitled to take the motorcycle and (6) that the motorcycle was taken during a burglary. The court further told the jury that if it had a reasonable doubt as to any one or more of the elements, then defendant would not be guilty of felonious larceny. These instructions, we think, give in substance, though not with the same specificity, the instructions requested by defendant and there was no error in refusing to give additional instructions.

These assignments of error are overruled.

### G.

[7] Defendant next contends that the trial court erred in failing to give his tendered instruction concerning identification of the defendant. Defendant particularly wanted this sentence of the tendered instruction given by the trial court: "The main aspect of identification is the observation of the offender by the witness at the time of the offense." Other portions of the tendered instructions would have highlighted the mental state of Mrs. Shaw at

the time of the incident and the adequacy of her eyesight. The tendered instruction would also have told the jury that it must find that Mrs. Shaw's in-court identification of the defendant was purely the product of her recollection and was derived only from her observation at the time of the offense.

The trial court rejected the tendered instruction and gave the following instruction with respect to identification:

> I instruct you that the State has the burden of proving the identity of the defendant as the perpetrator of the crimes charged beyond a reasonable doubt. This means that you, the jury, must be satisfied beyond a reasonable doubt that the defendant was the perpetrator of each of the crimes charged before you may return a verdict of guilty as to that particular crime.

Additionally, the trial court instructed the jury on determining a witness's credibility:

> You are the sole judges of the credibility of each witness. You must decide for yourselves whether to believe the testimony of any witness. You may believe all or any part or none of what a witness has said while on the stand.
>
> In determining whether to believe any witness, you should apply the same tests of truthfulness which you apply in your own everyday affairs. As applied to this trial, these tests may include the opportunity of the witness to see, hear, know or remember the facts or occurrences about which he or she has testified; the manner and appearance of the witness. Any interest, bias, or prejudice the witness may have. The apparent understanding and fairness of the witness. Whether that witnesses [sic] testimony is reasonable and whether the testimony is consistent with other believable evidence in the case.
>
> You are the sole judges of the weight to be given any evidence. By this I mean, if you decide that certain evidence is believable you must then determine the importance of that evidence in light of all other believable evidence in the case.

It is well established in this jurisdiction that the trial court is not required to give a requested instruction in the exact language

of the request. *E.g., State v. Beach*, 283 N.C. 261, 196 S.E. 2d 214 (1973). However, when the request is correct in law and supported by the evidence in the case, the court must give the instruction in substance. *See State v. Howard*, 274 N.C. 186, 162 S.E. 2d 495 (1968). We think the trial court here gave in substance that portion of the requested instruction which was correct in law. The instruction clearly emphasized the importance of proper identification of the defendant and emphasized that the burden of proving such identity beyond a reasonable doubt was on the State. Read contextually, the charge adequately explained to the jury the various factors they should consider in evaluating the testimony of witnesses. The instructions given by the trial court adequately conveyed the substance of defendant's proper request; no further instructions were necessary. *State v. Silhan*, 302 N.C. 223, 252-53, 275 S.E. 2d 450, 472 (1981). Indeed, we tend to agree with the argument of the district attorney that the tendered instruction would have been practically tantamount to charging the jury that determination of the perpetrator of these crimes could only result from the testimony of Mrs. Shaw. As noted in other portions of this opinion, there was other testimony which tended to show that defendant was the perpetrator of these crimes, including defendant's own admission that he had been in the home that evening and had had sexual intercourse with Mrs. Shaw.

This assignment of error is overruled.

H.

[8] Defendant was indicted for first degree rape pursuant to G.S. 14-27.2 which requires, *inter alia*, infliction of serious personal injury upon the victim. Defendant contends that the trial court erred in not submitting the lesser included offense of second degree rape and attempted second degree rape because he believes that under the evidence presented, a jury could have found that a rape or attempted rape by force, against the victim's will and by physical abuse occurred, but that the injuries suffered by Mrs. Shaw were not the serious personal injuries required under the statute. We disagree.

The rule is well established in this jurisdiction that the court is not required to submit to the jury the question of defendant's guilt of a lesser degree of the crime charged in the indictment when the State's evidence is positive as to each and every ele-

ment of the crime charged and there is no conflicting evidence relating to any element of the charged crime. *State v. Harvey*, 281 N.C. 1, 187 S.E. 2d 706 (1972). The State's evidence is positive and there is no conflicting evidence relating to the element of the crime of rape here referred to by defendant. That serious personal injury was inflicted upon Mrs. Shaw by this incident is left without question by the evidence presented. The evidence established that Mrs. Shaw had been severely beaten, resulting in multiple contusions and a large bite on her arm, multiple abrasions on her face, a one and one-half inch long laceration on the left side of her scalp, abrasions on both legs, and fractured ribs on her left side. Defendant's contention that such injury to a seventy-eight-year-old woman could be considered by anyone on any jury as anything less than "serious personal injury" as contemplated by the statute comes very close to insulting the intelligence of this Court. The trial court properly did not submit the lesser included offense of second degree rape. Likewise, defendant's contention that attempted second degree rape should have been submitted must also fail.

### III.

We conclude that this defendant received a fair trial, free from prejudicial error.

No error.