An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-52

Filed: 18 August 2015

Mecklenburg County, No. 11 CRS 229597, 229821

STATE OF NORTH CAROLINA

v.

DYMOND J. MOORE

Appeal by defendant from judgment entered 20 August 2014 by Judge Lisa C. Bell in Mecklenburg County Superior Court. Heard in the Court of Appeals 4 June 2015.

> *Attorney General Roy Cooper, by Special Deputy Attorney General Melissa L. Trippe, for the State.*

> *Cooley Law Office, by Craig M. Cooley, for defendant-appellant.*

INMAN, Judge.

Dymond Moore ("defendant") appeals from judgment entered after a jury found him guilty of second-degree kidnapping and attempted second-degree rape. Defendant argues on appeal that the trial court committed reversible error by: (1) denying defendant's motion to suppress the results of an out-of-court show-up identification by the alleged victim, J.R.[1]; (2) denying defendant's request to give a

---

[1] To protect the privacy of the alleged victim of sexual assault in this case, we use her initials.

special jury instruction on the lack of perpetrator identification during trial; (3) denying defendant's motion for a mistrial; (4) ordering defendant to show his bare chest to the jury; and (5) denying defendant's motion to dismiss the charge of second-degree kidnapping. Additionally, defendant contends that the cumulative errors rendered the trial fundamentally unfair.

After careful review, we conclude that the trial was free from error.

## Background

The evidence presented at trial tended to show the following: On 26 June 2011 at approximately 1:30 a.m., J.R. left her apartment to meet a friend, Katyree Simpson ("Simpson"), at the gym in their apartment complex. The gym was approximately a five-minute walk from defendant's apartment. On the way, J.R. walked past a woman and two other men; the men tried to get J.R.'s attention, but she kept walking toward the gym.

When she was about fifteen feet away from the door to the gym, J.R. heard a noise and looked back to see a man running towards her. He asked for her name, but J.R. declined to give it to him. The man then grabbed J.R. and threw her onto the ground. He tried to drag her into row of bushes next to the adjacent building, but J.R. fought back and screamed for help. The attacker reached into his pocket and told J.R. that if she did not stop screaming, he would shoot her. He also put his hands over J.R.'s mouth. She told the assailant that she could not breathe and that she was

claustrophobic, but the assault continued. The man tried to forcibly remove J.R.'s pants, but he was only able to pull them halfway down her legs.

At that point, Simpson walked out of the gym and saw the altercation. The assailant ran away upon seeing Simpson, but stopped momentarily when he dropped a hat. Simpson picked up the hat and gave it back to the assailant, who then sprinted away. Simpson then called the police at 1:59 a.m.

The first officer to arrive at the scene, Officer Nicholas Vincent ("Officer Vincent"), noted that J.R. was "visibly upset" and "shaking." J.R. described her attacker to Officer Vincent as an African American male with no shirt, blue jean-type shorts, with short twists or braids in his hair.

After speaking with J.R., Officer Vincent called Detective Danielle Williams ("Detective Williams"), who took a written statement from J.R. In that statement, J.R. described her attacker as a dark-skinned black male with blue jean shorts and blue shorts underneath, wearing no shirt, with a baseball cap and a tattoo on his chest.

After interviewing J.R., the police searched for potential suspects around the apartment complex. They apprehended two individuals, one of whom was defendant. The officers then conducted a "show-up" identification procedure, wherein both suspects were brought before J.R., who was seated in Detective Williams's police car. J.R. initially identified defendant as her attacker, then requested that he have his

shirt removed. When the officers removed defendant's shirt to reveal a tattoo on his chest, J.R. said she was "100 percent" sure that he was the man who attacked her.

The police took J.R.'s clothing to test for biological evidence. Her gym pants revealed a mixture of DNA of at least three individuals, from which neither J.R. nor defendant could be excluded. An expert in DNA analysis testified at trial that one in thirteen individuals could have contributed to a portion of that mixture, excluding 92.58 percent of the population.

Defendant was arrested and charged with second-degree kidnapping and attempted second-degree rape. He was convicted on both counts by the jury and sentenced to 60 to 81 months imprisonment. Defendant gave notice of appeal in open court.

## I. Show-up Identification

Defendant's first argument on appeal is that the trial court committed reversible error by denying his motion to suppress evidence related to the show-up identification. We disagree.

"The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Biber*, 365 N.C. 162, 167-68, 712 S.E.2d 874, 878 (2011). "Conclusions of law are reviewed de novo and are subject to full review." *Id.*

A "show-up" identification is the practice of "showing suspects singly to persons for the purpose of identification, and not as part of a lineup[.]" *State v. Oliver*, 302 N.C. 28, 44, 274 S.E.2d 183, 194 (1981) (quotation marks omitted). Show-ups "may be inherently suggestive because the witness would likely assume that the police had brought [her] to view persons whom they suspected might be the guilty parties." *Id.* (quoting *State v. Matthews*, 295 N.C. 265, 284, 245 S.E.2d 727, 739 (1978)). The suggestive nature of show-ups is not fatal to their admissibility at trial. *See State v. Turner*, 305 N.C. 356, 364, 289 S.E.2d 368, 373 (1982) ("Pretrial show-up identifications . . . , even though suggestive and unnecessary, are not *per se* violative of a defendant's due process rights.").

Our Supreme Court has recognized that "[t]he test under the due process clause as to pretrial identification procedures is whether the totality of the circumstances reveals pretrial procedures so unnecessarily suggestive and conducive to irreparable mistaken identification as to offend fundamental standards of decency, fairness and justice." *State v. Henderson*, 285 N.C. 1, 9, 203 S.E.2d 10, 16 (1974), *judgment vacated in part on other grounds*, 428 U.S. 902, 49 L. Ed. 2d 1205 (1976).

> In evaluating such claims of denial of due process, this Court employs a two-step process. First, we must determine whether an impermissibly suggestive procedure was used in obtaining the out-of-court identification. If this question is answered in the negative, we need inquire no further. If it is answered affirmatively, the second inquiry we must make is whether, under all the circumstances, the

suggestive procedures employed gave rise to a substantial likelihood of irreparable misidentification.

*State v. Leggett*, 305 N.C. 213, 220, 287 S.E.2d 832, 837 (1982). The factors to be considered in evaluating the likelihood of irreparable misidentification include:

(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*State v. Harris*, 308 N.C. 159, 164, 301 S.E.2d 91, 95 (1983) (citing *Manson v. Brathwaite*, 432 U.S. 98, 53 L. Ed. 2d 140 (1976)) ("the *Manson* factors").

Here, the trial court concluded that although the show-up was impermissibly suggestive, the totality of the circumstances demonstrated that there was no substantial likelihood of irreparable misidentification. As to the *Manson* factors, the trial court found the following: (1) J.R. had ample opportunity to view her assailant, as the attack lasted between 15 and 19 minutes; (2) J.R. was in close, face-to-face proximity with her attacker; (3) J.R. described her attacker to the officers, including the specific identifying mark of the chest tattoo; (4) there was a short time between the attack and the show-up; and (5) J.R. identified her assailant with 100 percent certainty when the officers removed his shirt to reveal the tattoo.

Because the State does not dispute that the show-up was impermissibly suggestive, the only contention on appeal is whether the circumstances demonstrated

a substantial likelihood of irreparable misidentification. Defendant contends that the trial court's findings pertaining to the description of the attacker and his tattoo are unsupported by the record. Specifically, defendant challenges the trial court's findings that J.R. gave a "consistent" description of the perpetrator and "specifically" described the tattoo on his chest. We note that the trial court did not use the words "consistent" in its characterization of J.R.'s assailant description, nor did it find that J.R. described the tattoo "specifically"—the trial court merely noted "the description given by the victim to the officers initially" and "the specific identifying mark of the tattoo as identified by the victim" in support for its conclusion that the show-up was admissible. These findings are supported by competent evidence.

J.R. first told Officer Vincent that the perpetrator was a black male with blue-jean type shorts and no shirt, with short twists or braids in his hair. When asked if J.R. mentioned a hat or tattoos to him, Officer Vincent responded "[n]ot that I recall."[2] J.R. then gave a statement to Detective Williams, describing her attacker as a dark-skinned black male with short dreadlocks, wearing a hat, blue jean shorts with blue shorts underneath, and no shirt, revealing a tattoo across his chest.

Contrary to defendant's argument, these descriptions are substantially consistent. Officer Vincent was among the first police officers on the scene, and he was the first to receive a description from J.R. At the time he spoke with her, J.R.

---

[2] We note that, contrary to defendant's interpretation of this statement, Officer Vincent did not affirmatively testify that J.R. failed to mention the hat or tattoo to him.

was visibly upset and shaking. Although the information given to Officer Vincent was not as thorough as that in the written statement later given to Detective Williams, it was not contradictory. The mere fact that J.R. gave Detective Williams more details relating to the hat and tattoo does not reflect inconsistencies in her description. And although defendant contends that J.R. failed to describe her attacker's eyes, lips, facial features, and body type, Detective Williams testified that she did not ask J.R. about the perpetrator's facial features because her common practice is simply to get a general description, including sex, race, height, and weight, which J.R. provided.

Accordingly, we conclude that the trial court's findings of fact are supported by competent evidence, and those findings support the legal conclusion that the show-up did not give rise to a substantial likelihood of irreparable misidentification. All of the factors identified by the *Manson* Court and applied repeatedly by appellate courts in this state weigh in favor of admissibility. *See Harris*, 308 N.C. at 164, 301 S.E.2d at 95; *State v. Jackson*, __ N.C. App. __, __, 748 S.E.2d 50, 58 (2013).

Nevertheless, defendant contends that the trial court committed reversible error by failing to apply the more rigorous examination used in *State v. Henderson*, 27 A.3d 872 (N.J. 2008), a New Jersey Supreme Court decision which, based on scientific evidence tending to show that the *Manson* factors did not adequately provide a sufficient measure of reliability, revised that court's framework to assess

show-up identifications. This Court has previously declined to adopt *Henderson* in the context of jury instructions, and we decline to do so here, for the same reason—it would "put this Court in the position of making factual determinations and exercising rule-making authority, neither of which we have the authority to do." *State v. Watlington*, __ N.C. App. __, __, 759 S.E.2d 116, 130 (2014). Because the *Manson* factors have been consistently applied by both of our appellate courts to assess the admissibility of out-of-court show-ups for decades, we decline to stray from that line of authority. Defendant's argument is overruled. Because the trial court did not err in admitting evidence related to the show-up identification, we need not address whether the evidence was prejudicial.

## II. Special Jury Instructions

Defendant next argues that the trial court committed reversible error in failing to give a requested special jury instruction regarding the lack of in-court identification of defendant as the attacker. We disagree.

It is well-settled that "if a request be made for a special instruction, which is correct in itself and supported by evidence, the court must give the instruction at least in substance." *State v. Lamb*, 321 N.C. 633, 644, 365 S.E.2d 600, 605-06 (1988). However, "[i]n instructing the jury, the judge shall not express an opinion as to whether or not a fact has been proved and shall not be required to state, summarize

or recapitulate the evidence, or to explain the application of the law to the evidence."

N.C. Gen. Stat. § 15A-1232 (2013).

Here, defendant requested that the trial court give the following special

instruction:

> The State has presented testimony of [J.R.]. [J.R.], during
> her testimony did not identify Mr. Dymond Moore in court
> as the person who committed the crimes charged. You may
> use the lack of an in court identification as evidence that
> the State has not proven beyond a reasonable doubt that
> Dymond Moore is the perpetrator of the crimes charged.

The trial court declined to give defendant's proposed instruction on the ground

that it would have required the trial court to "speak to or attempt to recite or remind

the jury of specific testimony as it may or may not have been." Instead, the trial court

gave Pattern Jury Instruction 104.90, Identification of the Defendant as the

Perpetrator of a Crime:

> I instruct you that the State has the burden of proving the
> identity of the defendant as the perpetrator of the crime[s]
> charged beyond a reasonable doubt. This means that you,
> the jury, must be satisfied beyond a reasonable doubt that
> the defendant was the perpetrator of the crime[s] charged
> before you may return a verdict of guilty.

N.C.P.I. Crim. 104.90.

We discern no error in the trial court's instructions. The trial court properly

declined to instruct the jury that J.R. failed to identify defendant as her attacker

during her testimony, as that instruction would violate section 15A-1232's prohibition

against "stat[ing], summarize[ing], or recapitulate[ing]" the evidence. Defendant argues that the trial court reminded the jury of certain other facts in the instructions, and therefore it should not be prevented from commenting on the evidence in defendant's special instruction. The trial court's other jury instructions are not within the scope of this appeal, and they do not render defendant's proposed instruction any less violative of section 15A-1232.

Furthermore, the Pattern Jury Instruction for "Identification of Defendant as the Perpetrator of the Crime" adequately conveyed the substance of defendant's requested instruction. We find guidance in *State v. Green*, 305 N.C. 463, 290 S.E.2d 625 (1982), in which the defendant requested that the trial court instruct the jury that "[t]he main aspect of identification is the observation of the offender by the witness at the time of the offense." *Id.* at 475, 290 S.E.2d at 633. The trial court refused to give the proposed instruction, and instead instructed the jury as to identification under N.C.P.I. Crim. 104.90, as the trial court did here. *Id.* at 476, 290 S.E.2d at 633. Also like the trial court here, the trial court in *Green* instructed the jury that it was the sole judge of witness credibility. *Id.* Our Supreme Court held that these instructions, when read together, sufficiently conveyed the substance of the defendant's request:

> The instruction clearly emphasized the importance of proper identification of the defendant and emphasized that the burden of proving such identity beyond a reasonable doubt was on the State. Read contextually, the charge

- 11 -

adequately explained to the jury the various factors they should consider in evaluating the testimony of witnesses. The instructions given by the trial court adequately conveyed the substance of defendant's proper request; no further instructions were necessary.

*Id.* at 477, 290 S.E.2d at 633.

*Green* is controlling on this matter. The trial court here gave the same instructions on defendant identification and witness credibility as the trial court in *Green*. Like the Supreme Court in *Green*, we hold that these instructions, when read contextually, "adequately conveyed the substance of defendant's proper request[.]" *Id.* Defendant's argument that the trial court committed reversible error in declining to give his special instruction is without merit.

### III. Mistrial

Defendant next argues that the trial court reversibly erred when it refused to grant a mistrial. We disagree.

A trial court must declare a mistrial "if there occurs during the trial . . . conduct inside or outside the courtroom [that results] in substantial and irreparable prejudice to the defendant's case." N.C. Gen. Stat. § 15A-1061 (2013). "The decision to grant or deny a mistrial lies within the sound discretion of the trial court and is entitled to great deference[.]" *State v. Taylor*, 362 N.C. 514, 538, 669 S.E.2d 239, 260 (2008) (quotation marks omitted). "Absent an abuse of discretion, therefore, the trial court's ruling will not be disturbed on appeal." *Id.* An abuse of discretion occurs when a

ruling is "manifestly unsupported by reason, which is to say it is so arbitrary that it could not have been the result of a reasoned decision." *State v. T.D.R.*, 347 N.C. 489, 503, 495 S.E.2d 700, 708 (1998).

Here, defendant contends that the trial court should have granted a mistrial when the State elicited hearsay testimony placing defendant near the scene of the crime. During the direct examination of State's witness Gabrielle Johnson, the woman J.R. identified as having been outside of the gym on the night in question, the following colloquy took place:

> Q: And please tell the jury who the people were that you were hanging out with.
>
> A: So at first it was just us and then I guess Dyrell or Derrell, I don't remember his name, but he was light skinned and his cousin had came over towards us. So at this time I was chilling and –
>
> Q: Were you introduced to his cousin?
>
> A: Yeah, he introduced him; yeah.
>
> Q: How did he introduce himself?
>
> A: He said this is my cousin Darrell. I mean not Darrell, Dymond.
>
> Q: Dymond?
>
> A: Yeah, that's the name he give --

Defendant moved to strike this testimony as being inadmissible hearsay and moved

for a mistrial. The trial court denied defendant's motion for mistrial, but allowed the

motion to strike and instructed the jurors as follows:

> Ladies and Gentlemen of the Jury, prior to your being excused there was an objection and a motion made concerning the last statement by Ms. Johnson.
>
> I will advise you that I've sustained the motion objecting to the statement, the last statement that she made regarding a name that might have been stated to her by another individual. You are to disregard that last statement. It is not to be considered by you as evidence when you deliberate.

Highlighting the facts that neither J.R. nor Johnson could identify defendant

as J.R.'s attacker in court, defendant contends that the trial court's instruction did

not cure the "substantial and irreparable prejudice caused by the prosecutor's

egregious questioning and Johnson's hearsay testimony." We disagree with

defendant's characterization of the prosecutor's questioning as "egregious." The trial

court acknowledged that the testimony in question was ambiguous as to whether

defendant introduced himself by name or whether he was introduced by his cousin.

The prosecutor initially challenged defense counsel's objection on the ground that if

the witness had learned defendant's name from defendant himself, an exception to

the hearsay rule would apply. Indeed, the question asked by the prosecutor was

"[h]ow did he introduce *himself*?" (Emphasis added.) It was only after the trial court

clarified with the witness outside the presence of the jury that defendant did not

introduce himself, but was introduced by his cousin, that the prosecutor acquiesced to the motion to strike that testimony.

Our Supreme Court has previously held that inadvertent hearsay testimony in an isolated instance "hardly represents prosecutorial misconduct," and does not "result in substantial and irreparable prejudice to [the] defendant's case" sufficient to grant a mistrial. *State v. Hill*, 347 N.C. 275, 297, 493 S.E.2d 264, 276 (1997). Furthermore, as noted in *Hill*, a trial court's curative instructions ordinarily dispel any prejudice that might arise from such testimony. *See id.*; *see also State v. King*, 343 N.C. 29, 45, 468 S.E.2d 232, 242 (1996) ("Our system of trial by jury is based upon the assumption that the trial jurors are men and women of character and of sufficient intelligence to fully understand and comply with the instructions of the court, and are presumed to have done so.").

Here, given the nature of the colloquy, the striking of the challenged testimony from the record, and the trial court's prompt curative instruction, we hold that defendant has failed to demonstrate that the trial court's denial of his motion for mistrial was "so arbitrary that it could not have been the result of a reasoned decision." *T.D.R.*, 347 N.C. at 503, 495 S.E.2d at 708. This argument is overruled.

### IV. Exhibition of Defendant's Chest

Defendant argues that the trial court's order to have him stand bare-chested before the jury violated his due process rights and was inadmissible under Rule 403 of the North Carolina Rules of Evidence. We disagree with both contentions.

*State v. Summers*, 105 N.C. App. 420, 422-23, 413 S.E.2d 299, 300 (1992), is dispositive on this issue. In *Summers*, the defendant argued that the trial court committed prejudicial error by ordering the defendant to display his teeth to the jury. *Id.* at 422, 413 S.E.2d at 300. As in this case, the defendant contended that this demonstration caused irreparable harm. *Id.* This Court disagreed, holding "[a]s long as the demonstration is relevant to the facts to be proved or disproved in the case, such a demonstration is permissible." *Id.* at 422-23, 413 S.E.2d at 300. The victim in *Summers* described her attacker as a "short, black, balding male, who had some teeth missing." *Id.* at 422, 413 S.E.2d at 300. In holding the demonstration of the defendant's teeth before the jury permissible, this Court stated: "In the case below, the victim described her assailant as a man with missing teeth. The District Attorney's request was therefore relevant to the case and the trial court's order was not error." *Id.* at 423, 413 S.E.2d at 300.

The facts of *Summers* are directly comparable to those here. The tattoo on the assailant's chest in this case, like the missing teeth in *Summers*, was one of the specific identifying factors that the victim used to describe her attacker. Here, as in *Summers*, one of the material facts to be proved was whether the defendant was the

person who attacked the victim. Indeed, "the identity of the perpetrator of the crime charged is always a material fact." *State v. Jeter*, 326 N.C. 457, 458, 389 S.E.2d 805, 806 (1990). Like the demonstration of the defendant's teeth in *Summers*, the demonstration of defendant's bare chest here was relevant to the case. The presence or absence of a tattoo on defendant's chest was probative, as the tattoo was the identifying mark that proved to be crucial to J.R.'s identification of her assailant during the show-up. Despite the fact that she was unable to identify defendant as her attacker during trial, evidence pertaining to the show-up identification— including the emphasis on the chest tattoo—was properly admitted, as discussed above.

We reject the argument that seeking to identify defendant as the perpetrator through this demonstration was impermissible. Defendant contends that *State v. Perry*, 291 N.C. 284, 230 S.E.2d 141 (1976) and *State v. Suddreth*, 105 N.C. App. 122, 412 S.E.2d 126 (1992), prohibit the demonstration of a defendant before a jury for the purpose of proving that the defendant was the individual who committed the underlying crime. We disagree. First, *Perry* and *Suddreth* are distinguishable because they concern orders to have the defendants don certain apparel, not exhibit their bodies. Second, although the Courts in both *Perry* and *Suddreth* noted that the purpose for the demonstration in those cases was not to identify the defendant as the

perpetrator, those decisions do not hold that such a purpose would be impermissible. Indeed, that conclusion would run counter to the holding in *Summers*.

"Unfair prejudice" in the context of Rule 403 means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one." *State v. Chapman*, 359 N.C. 328, 348, 611 S.E.2d 794, 811 (2005) (quotation marks omitted). Defendant correctly acknowledges the inference meant to be drawn from the demonstration here—that because J.R. saw a chest tattoo on her assailant, the presence of the tattoo on defendant's chest made it more likely that he was the perpetrator than if he did not have a tattoo on his chest. This inference is logical, not emotional or misleading, and defendant cites no authority to support his argument that it is improper. By referencing the potentially high number of individuals who might have the identifying features described by J.R., defendant merely attacks the weight of this evidence, which is an issue for the jury. *See State v. Ward*, 364 N.C. 133, 153, 694 S.E.2d 738, 750 (2010) ("[E]vidence may be shaky but admissible, and it is the role of the jury to make any final determination regarding the weight to be afforded to the evidence.") (quotation marks omitted).

Accordingly, we conclude that the trial court did not err by ordering defendant to exhibit his bare chest to the jury for the purpose of showing the presence or absence of a tattoo on his chest.

### V. Motion to Dismiss Second-Degree Kidnapping Charge

Defendant next argues that the trial court erred by denying his motion to dismiss the second-degree kidnapping charge, based on his argument that the State did not present evidence of force or restraint independent of the charge of attempted rape. We disagree, holding that the evidence of physical restraint was sufficient to support the kidnapping charge, because the restraint was not a necessary element of the attempted rape charge.

"This Court reviews the trial court's denial of a motion to dismiss de novo." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). To defeat a motion to dismiss, the State must present "substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000) (citations omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Denny*, 361 N.C. 662, 664–665, 652 S.E.2d 212, 213 (2007) (quotation marks omitted). In considering a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference drawn from that evidence. *Id.* at 665, 652 S.E.2d at 213.

In North Carolina,

> [a]ny person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person, or any other person under the age of 16 without the consent

of a parent or legal custodian of such person, shall be guilty of kidnapping if such confinement, restraint or removal is for the purpose of . . . [f]acilitating the commission of any felony.

N.C. Gen. Stat. § 14–39(a) (2013) (emphasis added). "[A] person cannot be convicted of kidnapping when the only evidence of restraint is that 'which is an inherent, inevitable feature' of another felony[.]" *State v. Ripley*, 360 N.C. 333, 338, 626 S.E.2d 289, 292 (2006) (citation omitted). The court may consider whether the defendant's acts place the victim in greater danger than is inherent in the other offense, or subject the victim to the kind of danger and abuse that the kidnapping statute was designed to prevent. *State v. McNeil*, 155 N.C. App. 540, 546, 574 S.E.2d 145, 149 (2002). The court also considers whether the defendant's acts "cause additional restraint of the victim or increase the victim's helplessness and vulnerability." *State v. Smith*, 359 N.C. 199, 213, 607 S.E.2d 607, 618 (2005). "One who . . . by the threatened use of a deadly weapon, is restricted in his freedom of motion, is restrained within the meaning of this statute." *State v. Fulcher*, 294 N.C. 503, 523, 243 S.E.2d 338, 351 (1978).

Here, the State presented evidence tending to show that when J.R. was attacked, her assailant tried to drag her into the bushes on the side of the apartment building. J.R. fought and struggled to escape, screaming loudly in hopes that someone would wake up and help her. Her attacker kept dragging her. He then reached into his pocket and said that if J.R. did not stop yelling he would shoot her.

J.R. tried to move, but the perpetrator pulled her to the ground and covered her mouth with his hands. J.R. couldn't breathe and she felt as if she were going to pass out. J.R. asked the attacker repeatedly to remove his hands from her mouth; she did not want to pass out for fear that he would hurt her if she was unconscious. After managing to pull J.R.'s pants halfway down her thighs, the assailant released her and fled when Simpson approached them.

Taking this evidence in the light most favorable to the State, *Denny*, 361 N.C. at 665, 652 S.E.2d at 213, we conclude that the trial court properly denied defendant's motion to dismiss the charge of second-degree kidnapping. Defendant contends that the threat of force used to restrain J.R. and the restriction of her breathing by covering her mouth "did not expose her to any greater danger than that inherent in the rape or subject her to the kind of danger the kidnapping statute was designed to prevent." We find this argument unpersuasive.

First, defendant was not charged with rape; he was charged with attempted rape. The elements of any criminal attempt are: "(1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which goes beyond mere preparation, but (3) falls short of the completed offense." *State v. Miller*, 344 N.C. 658, 667, 477 S.E.2d 915, 921 (1996). The assailant committed a number of overt acts beyond mere preparation for the purpose of raping J.R.—he grabbed her from behind, tried to drag her into the bushes, and pulled her pants halfway down her legs.

The additional acts of threatening to shoot J.R. if she did not stop screaming and restricting her breathing by covering her mouth were not inherent to the crime of attempted rape. Instead, these actions "cause[d] additional restraint of the victim," and "increase[d] the victim's helplessness and vulnerability." *Smith*, 359 N.C. at 213, 607 S.E.2d at 618; *see also Ripley*, 360 N.C. at 340, 626 S.E.2d at 293-94.

J.R. testified that she stopped yelling when her attacker threatened to shoot her; thus, that was a separate action inessential to the crime of attempted rape that served to facilitate the crime. J.R. also testified that she could not breathe when the attacker covered her mouth with his hands and that she was concerned she would pass out and expose herself to further harm. Being unconscious would have prevented J.R. from resisting the attack, and also would have facilitated the commission of the offense and put her in more danger than that inherent in an attempted rape. *See McNeil*, 155 N.C. App. at 546, 574 S.E.2d at 149. Based on this reasoning, we hold that the threat of shooting J.R. and defendant's restricting her breathing by covering her mouth with his hands were sufficient to establish the element of restraint for the purposes of section 14-39(a).

Therefore, because the State presented substantial evidence of each element of second-degree kidnapping separate and apart from the elements of attempted second-degree rape, we conclude that the trial court did not err in denying defendant's motion to dismiss.

## VI. Cumulative Error

Defendant next argues that the trial court's cumulative errors rendered his trial fundamentally unfair. "Cumulative errors lead to reversal when taken as a whole they deprived the defendant of his due process right to a fair trial free from prejudicial error." *State v. Wilkerson,* 363 N.C. 382, 426, 683 S.E.2d 174, 201 (2009) (quotation marks omitted). Since we conclude that defendant has failed to demonstrate any errors that occurred during trial, we necessarily find no cumulative error. *See State v. Roddey*, 110 N.C. App. 810, 816, 431 S.E.2d 245, 249 (1993).

## VII. Conclusion

For the foregoing reasons, we hold that the trial was free from error.


NO ERROR.

Judges STROUD and MCCULLOUGH concur.

Report per Rule 30(e).